**John R. THACKER, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 89–326.**

District of Columbia Court of Appeals.

Argued Feb. 27, 1991.

Decided Nov. 14, 1991.

Kenneth H. Rosenau, Washington, D.C., appointed by this court, for appellant.

Shanlon Wu, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black, and G. Paul Howes, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before TERRY, Associate Judge, and KERN and BELSON,* Senior Judges.

---

* Judge Belson was an Associate Judge of the     court at the time of argument. He was commis-

TERRY, Associate Judge:

Appellant Thacker and a co-defendant, Joice Russell, were convicted of two counts each of first-degree burglary while armed,[1] one count each of armed robbery,[2] three counts each of first-degree felony murder while armed,[3] and one count each of first-degree premeditated murder while armed.[4] Both Thacker and Russell noted appeals from their convictions, but for reasons unknown to us (contrary to this court's usual practice) the two appeals were not consolidated. Russell's conviction was recently affirmed by another division of this court. *Russell v. United States,* 586 A.2d 695 (D.C.1991). In this appeal Thacker makes several assignments of error. We reject them all, vacate those convictions that merge, see part VII, *infra,* and affirm the judgment in all other respects.

I

In August 1986 Denise Lewis lived with her mother in an apartment about a five-minute walk from the apartment of William Jefferson. On August 30, shortly before 9:00 o'clock in the evening, Lewis went to Jefferson's apartment to purchase $50 worth of cocaine. She stayed there for the next few hours, during which time the two of them smoked cocaine and engaged in oral sex.

Jefferson received three telephone calls while Lewis was in his apartment that evening. During the second call Jefferson screamed at the caller, "You owe me, you owe me, hell no, I'm not giving you shit," before banging down the receiver. The phone rang again about five minutes later. During this call Jefferson yelled even louder than before, telling the caller, "You want to come over here and get this goddamn shit and you owe me money, goddamn it, come and get it." Jefferson then slammed the phone down again and told Lewis to "clean up, clean up everything." He gave Lewis some cocaine, which she hid in a pack of cigarettes. Jefferson then went into the bedroom to prepare a package of cocaine, apparently for the person who had just called him.

Joice Russell, Thacker's co-defendant and Jefferson's former girl friend, arrived at the apartment a short time later. Russell asked Jefferson, "Where is the package?" and Jefferson responded, "Where is the money?" Russell said that she did not have the money with her, but that a woman downstairs in the car wanted to examine the package before purchasing it. Jefferson told Russell to go and get the woman. Russell left, and Jefferson sat back down on the couch with Lewis. A few minutes later there was a knock at the door, and as Jefferson began to open it, Thacker and Russell burst into the room. Lewis ran toward the kitchen after hearing Thacker yell at Jefferson, "Hold it right there, mother fucker, didn't I tell you don't fuck with Joice."[5] Russell followed Lewis into the kitchen, threatening her with a knife. Lewis saw Thacker standing over Jefferson with another knife, which Thacker had pulled from a sheath he was carrying. Thacker screamed, "Where is it, goddamn it, where is it at?" at Jefferson, who was lying on the floor on his back. Jefferson insisted that he did not have anything.

Russell left Lewis in the kitchen and returned to the living room, where Thacker was asking Jefferson, "Where is it at?" Thacker told Russell to gag Jefferson, and she apparently did so; Lewis saw Russell

sioned as a Senior Judge on July 24, 1991.

1. D.C.Code §§ 22-1801(a), 22-3202 (1989).

2. D.C.Code §§ 22-2901, 22-3202 (1989).

3. D.C.Code §§ 22-2401, 22-3202 (1989).

4. D.C.Code §§ 22-2401, 22-3202 (1989).

5. This may have been a reference to something Jefferson had done a few minutes earlier. Russell testified later in the trial that during her initial visit to the apartment, Jefferson had answered the door wearing a pair of Bermuda shorts with the fly open. She said that Jefferson had taken her into the bathroom, removed his sex organ from his shorts, placed it about two inches from her face, and asked her to perform oral sex on him. Russell pushed him away and told him "that he had to be out of his mother fucking mind." Russell's testimony was impeached as to the color and style of the shorts, but not as to what she said about Jefferson's conduct.

put something in Jefferson's mouth [6] and then heard Jefferson choking. After Russell removed whatever was in Jefferson's mouth, Jefferson again insisted that he did not have anything. Thacker told Jefferson, "If you don't give it to me, I will slash your goddamned eyes out." Lewis then heard Jefferson scream, "My face, my face," and saw Jefferson stumbling around with deep cuts on his face, legs, and chest. All this time Jefferson was screaming, "Don't hurt me, don't hurt me." Jefferson staggered over to some curtains by the window, but Thacker pursued him. Thacker stabbed Jefferson in the right side of his abdomen, then moved the knife over to the left side of Jefferson's abdomen before removing it. Jefferson fell face down on the floor, apparently dead or dying. Thacker felt for Jefferson's pulse and said, "He's gone."

Thacker then ransacked the apartment. Initially he threatened to kill Lewis, but after Russell talked him out of it, he merely forced Lewis to help clean up the blood, saying that he would kill her "the same way he did [Jefferson]" if she told anyone what had happened. All three then left the apartment and drove off in Thacker's van. Thacker and Russell dropped Lewis off at an abandoned building after warning her once again not to say anything to anyone.

The next day Thacker and Russell visited Monique Mitchell, Jesse Gulley, and Johnny Nelson. In the course of their visit, both of them told Mitchell in grisly detail about the murder of Jefferson and warned her that what she had just heard was to "stay in this house or else."

Jefferson's body was discovered a few days later. A deputy medical examiner, Dr. Marie–Lydie Pierre–Louis, testified at trial that there were five stab wounds to Jefferson's body and that two of them, one to the chest and one to the abdomen, were "lethal." The doctor also testified that Jefferson had received seven other wounds to his thigh, hand, and shoulder, but these were defensive wounds, resulting from Jefferson's efforts to protect himself. Ac-

cording to the medical examiner, Jefferson died as a result of the two main stab wounds, from which he bled to death.

Russell testified in her own defense, claiming that, to the extent she was involved in the crime at all, Thacker had forced her to participate. Thacker presented no evidence.

## II

Thacker contends that the evidence was insufficient to support his conviction of first-degree premeditated murder.[7] He argues that the only evidence that could support the required finding of premeditation is Lewis' testimony about the two telephone calls to Jefferson's apartment a short time before his death. Thacker maintains that the trial court abused its discretion by allowing the testimony about these calls into evidence because there was no proof that he or Russell made either call. He urges us to hold that the evidence of the phone calls was erroneously admitted and that the remaining evidence was insufficient to support a finding of premeditation and deliberation.

We need not decide whether the trial court erred in admitting the evidence of the phone calls if we conclude that there was enough other evidence, apart from the phone calls, to support the first-degree murder verdict. We therefore examine the sufficiency of the other evidence, viewing it as we must in the light most favorable to government, and recognizing the right of the jury to assess credibility and to draw reasonable inferences from all the evidence presented. *United States v. Hubbard*, 429 A.2d 1334, 1337–1338 (D.C.) (citing cases), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); *Byrd v. United States*, 388 A.2d 1225, 1229 (D.C.1978) (citing cases).

To prove first-degree premeditated murder, the government must show beyond a reasonable doubt that the defendant

---

**6.** Lewis could not see what this object was, but other testimony indicates that it was probably a spoon.

**7.** Thacker does not challenge the sufficiency of the evidence supporting his three felony murder convictions.

acted with premeditation and deliberation. *McAdoo v. United States,* 515 A.2d 412, 427 (D.C.1986); *Watson v. United States,* 501 A.2d 791, 792 (D.C.1985); *Hall v. United States,* 454 A.2d 314, 317 (D.C.1982); *Head v. United States,* 451 A.2d 615, 623 (D.C.1982). Premeditation requires proof that the defendant gave "thought before acting to the idea of taking a human life and [reached] a definite decision to kill." *Watson, supra,* 501 A.2d at 793 (citation omitted); *accord, McAdoo, supra,* 515 A.2d at 427; *Head, supra,* 451 A.2d at 623. Deliberation requires proof that the defendant acted with "consideration and reflection upon the preconceived design to kill, turning it over in the mind, giving it second thought." *Watson, supra,* 501 A.2d at 793 (citation omitted). Both premeditation and deliberation may be inferred from the facts and circumstances surrounding the killing. *McAdoo, supra,* 515 A.2d at 427; *Head, supra,* 451 A.2d at 623. The fact that the accused carried the murder weapon, or indeed any deadly weapon, to the murder scene is highly probative of premeditation and deliberation. *McAdoo, supra,* 515 A.2d at 427; *United States v. Brooks,* 146 U.S.App.D.C. 1, 8–9, 449 F.2d 1077, 1084–1085 (1971).

■ In addition to the phone calls, the evidence showed that Thacker brought a knife to Jefferson's apartment, screamed at Jefferson about his involvement with Russell, and then proceeded to stab Jefferson repeatedly while Jefferson pleaded for his life. The fact that Thacker brought the knife with him is "highly probative of premeditation and deliberation ... as it permits the inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill."

*McAdoo, supra,* 515 A.2d at 427 (citations and internal quotation marks omitted).[8] Furthermore, a reasonable juror could fairly conclude from Thacker's remarks to Jefferson (not to "fuck with Joice") that Thacker's motive for the murder was jealousy.[9] This evidence was more than sufficient to support a conclusion that Thacker gave "thought before acting ... and [reached] a definite decision to kill." *Watson, supra,* 501 A.2d at 793 (citation omitted). We therefore hold that the government introduced sufficient evidence, apart from the evidence of the phone calls, to support the jury's finding of premeditation.

■ A reasonable juror could also conclude from the evidence that Thacker acted with deliberation in killing Jefferson. Thacker stabbed Jefferson at least five times while Jefferson pleaded repeatedly for his life. Jefferson attempted to crawl away before Thacker inflicted the final stab wound. This evidence would support an inference that Thacker gave the killing a "second thought" before inflicting the final wound. *Fisher v. United States,* 328 U.S. 463, 470, 66 S.Ct. 1318, 1322, 90 L.Ed. 1382 (1946); *accord, e.g., Frendak v. United States,* 408 A.2d 364, 371 (D.C.1979). That is all that is required; "the time involved may be as brief as a few seconds." *Watson, supra,* 501 A.2d at 793 (citation omitted).

■ In sum, we hold that the evidence before the jury, other than the testimony about the two phone calls, was sufficient to prove that Thacker killed Jefferson with premeditation and deliberation. We therefore need not address Thacker's claim that the trial court abused its discretion in admitting Lewis' testimony about the phone

8. Indeed, we recently held that a jury could permissibly infer premeditation from the fact that the defendant carried the murder weapon from one room of an apartment to another, because "premeditation is not necessarily a protracted process." *Mills v. United States,* 599 A.2d 775, 782 (D.C.1991).

9. Thacker argues that his conviction cannot stand because "[j]ealousy, rather than calcula-

tion, seemed to govern his actions...." As the government correctly argues in response, the fact that jealousy motivated Thacker to kill Jefferson does not mean that Thacker did not plan and deliberate before killing Jefferson. Indeed, the fact that Thacker had a motive makes a finding of premeditation all the more reasonable. "The presence of a motive suggests a purposeful or reasoned killing." *Hall, supra,* 454 A.2d at 317 (citations omitted).

calls.[10]

## III

Thacker argues that the trial court erred in allowing the government to introduce into evidence five photographs of the crime scene which even the prosecutor characterized as "gruesome." As with most evidentiary rulings, we are dealing here with a matter entrusted to the sound discretion of the court. "[P]ictures of the decedent in a murder case are admissible, in the discretion of the trial court, so long as they have some probative value and are not intended solely to inflame the jury." *Womack v. United States*, 339 A.2d 37, 38 (D.C.1975) (citation omitted). "Reversal is warranted only upon a showing of an abuse of that discretion." *Pittman v. United States*, 375 A.2d 16, 19 (D.C.1977) (citations omitted).

■ Thacker argues that the photographs should have been excluded because they were cumulative of other evidence. That fact, however, does not make them inadmissible, so long as their probative value outweighs any prejudice resulting from their use. *Hammond v. United States*, 501 A.2d 796, 798 (D.C.1985). Three of the photographs, government's exhibits 3, 4, and 7, show very little of the decedent's body; only his feet are visible. The fourth photograph, government's exhibit 11, shows a large bloodstain on the carpet where Jefferson fell after being fatally stabbed. These four photographs were introduced during Lewis' testimony to show that she was able to see what was occurring and to corroborate her testimony. Exhibit 3 was offered to show Lewis' position on the couch, from which she could hear Jefferson's end of the phone conversations. Exhibit 4 depicted the drug paraphernalia that Lewis and Jefferson had used earlier.

Exhibits 7 and 11 showed the position of Jefferson's body in the apartment after he was stabbed the last time. All of these photographs were probative of what Lewis could see from the couch, and later from the kitchen, while Thacker was attacking Jefferson. None of them are revolting or unduly gruesome, and therefore none are especially prejudicial. We are satisfied that their probative value clearly outweighed any prejudice caused by their admission into evidence and that the trial court did not abuse its discretion by allowing the jury to see government's exhibits 3, 4, 7, and 11.

■ The fifth photograph, government's exhibit 30, is more troubling. The photograph is somewhat revolting, for it depicts the decomposed state of Jefferson's body; furthermore, it was cumulative evidence with minimal probative value. The government contends that exhibit 30 was offered to rebut Russell's testimony about Jefferson's clothing. It is true that Russell admitted, when confronted with the photograph on cross-examination, that she was mistaken about what Jefferson had been wearing (see note 5, *supra*). It is also true, however, that the photograph was offered into evidence after Russell admitted her mistake.

On this point we are guided by the *Russell* opinion, in which Thacker's co-defendant challenged the admission of the same photograph. The government claimed in *Russell*, as it does here, that the photograph was introduced to refute Russell's testimony about what Jefferson was wearing. The court concluded that the photograph was cumulative in light of Russell's admission that she was mistaken about Jefferson's clothing, but that any error in admitting the photograph was harmless because the other evidence against Russell

---

**10.** Even if we were to consider on the merits Thacker's contention that the phone call evidence was erroneously admitted, we would have to conclude that there was no abuse of discretion. As the government points out, the jury could well have found premeditation and deliberation by inferring that Thacker had set up the murder by having Russell call Jefferson to arrange a cocaine pickup. Russell herself testified that she had called Jefferson before going to his apartment. Thus the phone calls, regardless of who made them, were properly before the jury. Whether Thacker made them, whether Russell made them on her own, or whether Russell made them at Thacker's direction was, as the trial court remarked, "a matter of argument."

was so strong. *Russell, supra,* 586 A.2d at 700. We reach the same conclusion in the instant case, and hold that any error in the admission of government's exhibit 30 was harmless as to Thacker.

IV

Thacker's principal argument on appeal is that the trial court abused its discretion by denying Russell's motion for a mistrial on the ground of prosecutorial misconduct, based on the prosecutor's contact with Lewis during the trial. He also contends that the court erred in curtailing his co-defendant's right to cross-examine Lewis about the content of her discussions with the prosecutor.

We note at the outset that Thacker's trial counsel did not pose any objection at trial and did not join in the motion of Russell's counsel for a mistrial.[11] Thacker must therefore demonstrate plain error affecting *his* substantial rights—not Russell's—before we will reverse on either of these grounds. *Chambers v. United States,* 564 A.2d 26, 29 n. 8 (D.C.1989); *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).

During his cross-examination of Lewis, counsel for Russell handed her a transcript of her grand jury testimony, which Lewis identified. Counsel also established that Lewis and the prosecutor had discussed her testimony on two occasions during the trial, once during a break in Lewis' testimony on the previous day, and again that morning before Lewis took the stand. The following then transpired:

BY MR. GOLDEN [counsel for Russell[12]]:

Q. On each of these occasions, did you and Mr. Howes [the prosecutor] talk about your testimony and what you had testified to?

A. No. He was just assuring me not to get upset and everything. He didn't have to talk to me about my testimony because I knew what I was going to say. I knew what it was.

Q. But did he talk to you about your testimony and not whether he had to, but did he?

A. Yes, he mentioned a few things to me.

Q. And did he tell you some things that maybe you had said wrong, or something that you should say that you had not said?

A. No, he didn't tell me anything that I had said wrong. ·

Q. But he did talk to you about your testimony.

A. Yes, pertaining to this paper [the grand jury transcript].

At this point counsel requested a bench conference, where the following occurred:

MR. GOLDEN: Your Honor, I move for a mistrial. This is absolutely prosecutorial misconduct. There is no way he is supposed to approach that witness to talk to her about her testimony, about anything in any regard whatsoever.

MR. HOWES: That's clearly not the law at all.

THE COURT: I don't know of any prohibition—

MR. GOLDEN: You instructed the witness, Your Honor—

THE COURT: *I have not instructed any witness that*—

MR. GOLDEN: *I know,* but you are required to tell a witness, don't talk to anybody about your testimony, and this man is the prosecutor.

THE COURT: Where is that required?

MR. GOLDEN: Your Honor, it's in the jury instructions. Every case that I have tried, the witness is instructed, don't talk to anybody about your testimony, and certainly Mr. Howes knows that.

THE COURT: Well, I don't. I don't permit—prohibit defense attorneys from talking to their witnesses, and I don't prohibit prosecutors from talking to their witnesses any more of course than I can't prohibit you from talking to your

---

11. Thacker is represented by different counsel on appeal.

12. As we have mentioned, Thacker's trial counsel never raised any objection to the prosecutor's contact with Lewis and said nothing at the ensuing bench conference.

clients. *I don't have a sufficient proffer to indicate that something wrong was done, anyway.*

MR. GOLDEN: The court's ruled?

THE COURT: Anything else?

MR. GOLDEN: That's all I have. [Emphasis added.]

After the bench conference ended, the parties returned to open court, where Russell's counsel said nothing further about Lewis' conversations with the prosecutor. Instead, he sought to impeach Lewis by showing that she had lied in her initial statement to the police. The court interrupted at only one point, noting that counsel was becoming repetitive.[13]

Thacker contends that the trial court abused its discretion by refusing to grant a mistrial on the ground that the prosecutor engaged in misconduct by talking with Lewis while the trial was in progress. Thacker asserts that there is (or should be) a general rule prohibiting prosecutors from speaking with government witnesses during a trial and that the court should have *sua sponte* ordered that Lewis be sequestered. He cites several cases standing for the proposition that the court has the *power* to sequester witnesses during a trial, *see, e.g., Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976), but he offers no authority suggesting that the court has a *duty* to do so. *Geders* holds only that the court may not prevent a defendant from talking to his or her attorney during an overnight recess in the trial because such an order would violate the defendant's Sixth Amendment right to counsel. *Id.* at 91, 96 S.Ct. at 1336. Thacker attempts to extrapolate from *Geders* a rule that attorneys are absolutely barred from talking to other witnesses, but neither *Geders* nor any other case of which we are aware offers any support for such a rule. We hold, accordingly, that the trial court was under no obligation to order *sua sponte* that the witness be sequestered. Furthermore, nothing in the record even hints at anything improper about the prosecutor's contact with Lewis, as the trial court recognized. We therefore find no error at all, and certainly no plain error affecting Thacker's substantial rights, in the trial court's denial of Russell's motion for a mistrial. We also find no support in the record for the assertion that the court curtailed the cross-examination of Lewis by Russell's counsel, and hence no reason to reverse Thacker's conviction on that ground.

## V

Thacker maintains that the prosecutor improperly appealed to the jury's passions in his closing argument by using seven overly colorful phrases: (1) "carved up," (2) "bad meat," (3) "tears ... too convenient," (4) "one person to speak for him," (5) "body decomposing," (6) "damnedest suicide you ever saw," and (7) "butchering." Since he failed to object to any of these remarks at the time they were made, however, Thacker must now demonstrate plain error in order to win reversal. Considering the prosecutor's remarks in context, we find no plain error.

We begin our discussion with an observation we have made in several other cases:

A fatal stabbing is not an antiseptic event which could or should be made to look pretty. Some types of cases, particularly those involving tragic death or injury, have an inherent emotional impact.... The prosecutor ... [is not] required to sanitize the government's evidence or make it appear less wrenching than it is.

*Dixon v. United States*, 565 A.2d 72, 76 (D.C.1989) (citations omitted); *accord, e.g.,*

---

**13.** Thacker asserts that Russell's attorney was attempting to explore the content of Lewis' discussions with the prosecutor when the trial court abruptly cut him off. This is a misreading of the record. Counsel cross-examined Lewis about the contents of her talks with the prosecutor without interruption before moving for a mistrial, and Thacker does not claim otherwise. Any suggestion that counsel was in the process of further delving into the conversations after the denial of the mistrial when the court cut off his cross-examination is without support in the record.

*Mills v. United States, supra* note 8, 599 A.2d at 786 ("Many of the challenged comments appear to us to have been descriptions of the evidence in an especially horrifying and gory case, and to have fallen within the limits of permissible argument"); *Powell v. United States,* 485 A.2d 596, 599 (D.C.1984) ("the emotional impact of this case evolved in large part from the facts, not the manner in which the government's case was presented or argued"). Although prosecutors should take care not to overdramatize facts which are already quite dramatic in themselves, the use of colorful language in cases such as this generally will not, without more, warrant reversal, especially when it elicits no objection from opposing counsel.

Turning to Thacker's particular claims of error, we must first determine whether the prosecutor's comments were improper. *Dixon v. United States, supra,* 565 A.2d at 75; *Irick v. United States,* 565 A.2d 26, 32 (D.C.1989). If we conclude that they were, we must then "consider the gravity of the [impropriety], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Id.* (citation omitted). Finally, since Thacker never objected to any of these remarks below, we will reverse his conviction only if the prosecutor's comments "so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial"—in other words, only if the judge's failure to intervene and take corrective action *sua sponte* constituted plain error. *Id.* at 32–33 (citations omitted). The Supreme Court has emphatically told us that reversal for improper prosecutorial comments on the ground of plain error, when defense counsel did not object to the comments at the time they were made, must be restricted to "particularly egregious" cases in which "a miscarriage of justice would otherwise result." *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations and internal quotation marks omitted). With these precepts in mind, we consider each of the seven challenged remarks.

The first reference to "carved up" occurred when the prosecutor argued that Russell was not afraid of Thacker on the night of the murder, as she had claimed, but was only now fearful of the consequences of her action. "There is one person in this courtroom who is afraid.... That person sits right there. Not the morning that William Jefferson was carved up on his apartment floor, not in the nights after when she called [a friend], but now." The phrase was repeated a few minutes later when the prosecutor challenged Russell's story that she and Lewis were engaged in conversation while Thacker was stabbing Jefferson: "Are you going to have a conversation with somebody who has just scared the jeebers out of you while in the living room somebody is being cut up, carved up?" Even if "carved up" was perhaps a little strong, it was not in either instance a mischaracterization of the evidence, which showed in grim detail the extent of Jefferson's wounds as well as Russell's lack of remorse at the crime scene despite the gory nature of the murder.

The mention of "bad meat" occurred when the prosecutor was attempting to show that Russell was responsible for the murder as well: "Now she's afraid because the truth is [that], but for Joice Russell, William Jefferson would not have died like so much bad meat on the morning of August [31,] 1986." While the image of "bad meat" was probably more vivid than necessary, we are not persuaded that it rises to the level of plain error, especially as to Thacker.

In the same vein, the reference to "tears ... too convenient" was made to show that Russell felt remorse only at the time of trial, not during the actual killing. The prosecutor was challenging her defense that she was a terrified, unwilling participant in the event. There is nothing in this remark that approaches any sort of error, especially as to Thacker. We conclude that it was a fair comment on the evidence.

The reference to "one person to speak for him" was made to show that

Lewis, as an eyewitness, was the only one (other than the two defendants) who could tell what happened to Jefferson. This was a permissible remark about her credibility. The trial judge's failure to intervene *sua sponte* certainly does not rise to the level of plain error.

■ The prosecutor spoke of Jefferson's "body decomposing" to warn the jury that a photograph they were about to see (government's exhibit 30) was gruesome. We agree with the government that this was not an appeal to passion but an attempt "to mitigate any possible shock that a photograph of the decomposed body might engender in the jury." We find no error at all associated with this remark.

■ The prosecutor said "damnedest suicide you ever saw" to point out the improbability of Thacker's claim of self-defense. Addressing Russell's testimony that Thacker had told her that Jefferson "lunged" at him, the prosecutor sought to underscore the improbability of Thacker's claim:

So I [Thacker] stabbed him, and he backed up and we talked about it, and then he lunged at me again. So I stabbed him some more, and he backed up and we talked about it—eleven times. It was the damnedest suicide you ever saw.

Although this comment was somewhat sarcastic, it was appropriately designed to counter Thacker's theory of self-defense. It surely does not rise to the level of plain error.

■ Finally, the prosecutor used the term "butchering" while arguing that Thacker had time to reflect upon what he was doing while he stabbed Jefferson, *i.e.*, to premeditate and deliberate:

William Jefferson is on his back terrified, and here is [Thacker] with the knife in his face ... and then he cuts him a little and he keeps cutting him.... In all of that assault, in all of that butchering, he had time to reflect on what he was doing.

This argument was directly relevant to the premeditation and deliberation elements of the principal crime with which Thacker was charged. "Butchering," like "carved up" and "bad meat," was a powerful metaphor, but in the absence of any objection we will not base a reversal on the prosecutor's choice of words.[14]

In sum, we find no plain error associated with the language used by the prosecutor in his closing argument. Considered separately or together, none of the seven contested words or phrases was so clearly prejudicial as to jeopardize the fairness and integrity of the trial. *Dixon, supra,* 565 A.2d at 75; *Irick, supra,* 565 A.2d at 32. The emotional impact of the case derived mainly from the facts. The prosecutor was under no duty to sugar-coat those facts or to make them less repellent than they actually were. His summation was forceful and sometimes melodramatic, but we cannot say that his use of vivid language, unchallenged at trial by able and experienced defense counsel, would justify either spontaneous intervention by the trial judge or plain-error reversal by this court.

## VI

Thacker asserts that the trial judge made disparaging remarks to both defense attorneys in front of the jury, remarks which were so prejudicial as to require reversal because they implied that the attorneys did not know how to do their job.[15] Thacker further contends that the judge's questioning of witnesses gave the appearance of

14. Some time earlier, in disputing Russell's assertion that she really loved Jefferson and was upset about his murder, the prosecutor had referred to Jefferson as lying "butchered on the floor." Here again the language was strong, but it was consistent with the evidence already before the jury. We see no plain error in the court's failure to correct the prosecutor's language *sua sponte.*

15. Thacker also argues that certain remarks made at bench conferences show that the trial judge was prejudiced against him. The short answer to this argument is that these remarks, even assuming they were prejudicial (and they were not), were made out of the jury's hearing and thus could have had no effect on the verdict. *Robinson v. United States,* 513 A.2d 218, 221 (D.C.1986).

belittling the merits of the defense case. Neither argument has merit.

A trial judge must remain "a disinterested and objective participant in the proceeding," *Billeci v. United States,* 87 U.S.App.D.C. 274, 283, 184 F.2d 394, 403 (1950), and must not be "clearly hostile to or [align] himself with" any of the parties in a trial. *Haughton v. Byers,* 398 A.2d 18, 21 (D.C.1979). However, the judge has "not only the right but the duty ... to participate directly in the trial, including the propounding of questions when it becomes essential to the development of the facts of the case." *Womack v. United States,* 350 A.2d 381, 383 (D.C.1976) (citations omitted); *accord, Haughton v. Byers, supra,* 398 A.2d at 20. We will reverse a trial court's decision to question a witness only if we conclude that the court abused its discretion in doing so. *See Womack v. United States, supra,* 350 A.2d at 383.

Many of Thacker's complaints involve the trial judge's questioning of witnesses. A review of the record convinces us, however, that in none of these instances did the judge's questions do anything more than to "mak[e] the case clear to the jurors." *Griffin v. United States,* 83 U.S.App.D.C. 20, 21, 164 F.2d 903, 904 (1947), *cert. denied,* 333 U.S. 857, 68 S.Ct. 727, 92 L.Ed. 1137 (1948). We hold that the trial judge did not abuse his discretion when he intervened on these occasions.

Thacker also argues that the trial judge's supposed hostility to his counsel amounted to a "belittling" of his case. This argument is plainly without merit. In all of the instances of which he complains, the judge had good reason to admonish defense counsel. For example, the judge told counsel to stop interrupting the witnesses before they had finished answering because it was hard for the court reporter to take down what they were saying. In addition, counsel repeatedly asked leading questions of his own witnesses. When the prosecutor objected, the judge warned defense counsel that he would instruct the jury to draw adverse inferences from the repeated leading questions. There was nothing improper about this warning; it

certainly did not belittle the merits of Thacker's defense.

Finally, we note that many of the supposedly adverse comments were addressed not to Thacker's counsel but to counsel for his co-defendant. On these occasions Thacker's attorney made no objection, so that once again Thacker must now demonstrate plain error. He has not done so. On the contrary, after reviewing the entire record, we can discern no prejudicial spillover affecting Thacker, even if we assume for the sake of argument that Russell was somehow prejudiced. We agree with the observation in the government's brief that "even if viewed in the worst light possible, the trial court's actions did not deprive appellant of a fair trial...."

## VII

Thacker was convicted of one count of first-degree premeditated murder and three counts of first-degree felony murder. The felony murder convictions were based on the underlying felonies of armed burglary and armed robbery, of which he was also convicted. The sentences for murder were ordered to run concurrently with each other, but consecutively to the burglary and robbery sentences.

When there is only one killing, the defendant may not be convicted of more than one murder. *See Catlett v. United States,* 545 A.2d 1202, 1219 (D.C.1988), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989). Thacker cannot remain convicted of both first-degree premeditated murder and first-degree felony murder of the same victim. Furthermore, the felony murder convictions merge with the underlying felonies. *Adams v. United States,* 502 A.2d 1011, 1026 & n. 22 (D.C.1986). In addition, as the government concedes, one of Thacker's convictions of armed burglary must be vacated because both are predicated on a single transaction. *Stewart v. United States,* 490 A.2d 619, 626 (D.C.1985).

We therefore remand this case to the trial court, as we did in *Russell, supra,* 586 A.2d at 701, with directions to vacate the

three felony murder convictions and one of the burglary convictions.[16] Ordinarily we would leave it to the trial court to decide, in its discretion, which three of the four murder convictions to vacate. *See, e.g., Harling v. United States*, 460 A.2d 571, 574 (D.C.1983). In this particular case, however, because the government specifically conceded in *Russell, supra*, 586 A.2d at 701 n. 8, that the three felony murder convictions should be vacated, and because we see no occasion to treat Thacker differently from Russell, we follow the same course here as in *Russell*. In all other respects we affirm the judgment of the trial court.

*Affirmed on the merits, remanded in part with directions.*

---

**16.** In so doing we stress that the trial judge acted quite properly in imposing sentence on every count on which Thacker was found guilty, leaving it for us to determine whether any convictions should be vacated. *See Garris v. United States*, 491 A.2d 511, 514–515 (D.C.1985).