**Clarence E. DADE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 93–CF–1504.**

District of Columbia Court of Appeals.

Argued Nov. 10, 1994.

Decided Aug. 17, 1995.

Gregory C. Powell, appointed by the court, with whom Thomas G. Ross, Riverdale, MD, was on the brief, for appellant.

Sima F. Sarrafan, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher,

Elizabeth Trosman, and Charles L. Hall, Assistant United States Attorneys, Washington, DC, were on the brief, for appellee.

Before WAGNER, Chief Judge, TERRY, Associate Judge, and BURNETT, Associate Judge of the Superior Court of the District of Columbia.[*]

TERRY, Associate Judge:

Appellant was convicted of kidnapping while armed[1] and possession of a firearm during a crime of violence.[2] On appeal he contends that the evidence was insufficient to support his kidnapping conviction, that the prosecutor made improper remarks during cross-examination and closing argument, that the trial court erroneously excluded evidence, and that the court omitted certain necessary language from a jury instruction. We affirm.

## I

Appellant Dade went to work for the Environmental Protection Agency (EPA) as a contract property administrator in January 1990. After he had been on the job for about nine months, he became embroiled in a dispute with another employee, Anthony Borda, involving a report that Dade had written. Because Borda had several years' seniority over Dade, their supervisor, Nathaniel ("Nate") Lewis, decided to remove Dade from his position and find him another slot within the same section. Dade, upset by his removal, filed a grievance with Lewis' superiors. A few weeks later, after tempers had cooled down significantly, and after several unsuccessful attempts to find another position for Mr. Dade within the section, Lewis reinstated him in his old job. After that, Dade and Borda managed "to work together and to get the job done," according to Lewis, although there were occasional "flareups" between them.

In October 1991 Dade resigned, explaining to Mr. Lewis that he was going back to his native California. He wanted to "make a new start" there and set out to find another government job. He did find a job, but it was not what he had hoped for, so he came back to the Washington area in November 1992. Shortly after his return, he went to see Mr. Lewis at his office and expressed an interest in returning to his previous position with the EPA. The position had remained vacant for budgetary reasons, but it was about to be advertised again, and Lewis told Dade that he "would not exclude him from consideration."

On the morning of March 19, 1993, using an expired employee identification card from another government agency where he had formerly worked, Dade entered the headquarters building of the EPA with a package in his hand and a .357 Magnum pistol concealed inside his shirt. After telling a security officer that he was going to deliver the package to Room 274, Dade was admitted and went to the office of Frank Sheffield, who worked in the same section where Dade had previously worked. Upon entering the office, Dade slammed the door, pulled out the gun, and pointed it at Sheffield. When Sheffield saw the gun, he asked, "Clarence, what are you doing?" Dade replied, "Frank, sit down, shut up, put your hands on your desk, or I'll blow your fucking head off." Still pointing the gun at Sheffield, Dade accused him of mistreating employees in the office and said that Nate Lewis and another supervisor "had used [Sheffield] to get to him." Sheffield answered, "I don't know what you're talking about." At one point Dade said that the gun "had a hair trigger" and that it "will blow your head off."[3]

Dade demanded that Sheffield telephone specific EPA directors and section chiefs, particularly Nate Lewis, Dade's former supervisor; "he asked me," Sheffield testified, "to call Nate Lewis more than any other person." Dade told Sheffield, "Don't worry, Frank, you'll live to see another day.... Nate is the person I want. He's the one that's going to get it." After approximately thirty minutes and several unsuccessful at-

---

[*] Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

[1] D.C.Code §§ 22–2101, 22–3202 (1989).

[2] D.C.Code § 22–3204(b) (1995 Supp.).

[3] Sheffield testified that "he really didn't need to say that to me. I was terrified."

tempts to reach Lewis, Dade forced Sheffield at gunpoint to walk to Lewis' office. Once there, he ordered Sheffield into the office and told him to sit down. Still standing in the doorway, Dade turned to Sue Ellen Gardner, a secretary who was seated nearby, and ordered her to come into the office also. Ms. Gardner was on the telephone, but when she realized Dade was holding a gun, she hung up the phone and walked over toward Dade. Dade grabbed her arm and told her to sit down, but she pulled loose from his grasp and hurried away to call a security guard.

Dade then entered Lewis' office and closed the door. Pointing the gun again directly at Sheffield, Dade ordered him to sit behind Lewis' desk (Lewis was not there) and to continue trying to contact various EPA officials by telephone. When he finally managed to reach the security office, Dade demanded to speak with someone in the office of the EPA Administrator, Carol Browner.[4] Dade told Sheffield that as soon as he was able to talk to someone from the Administrator's office, "this will be over and I will let you go."

Dade was put in touch with a woman in the Administrator's office, but when he found out that she was part of the "old regime," he refused to talk with her and insisted on speaking to a newer member of the staff. Finally, Dade was satisfied to speak with Charles Fox, and after a brief conversation in which Fox assured Dade that he would look into certain matters, Dade turned the gun away from Sheffield and unloaded the bullets into his hand. Dade then gave the gun and bullets to Sheffield, who turned them over to security officers waiting just outside the door. By then Dade had detained Sheffield at gunpoint for approximately an hour.

Dade's defense consisted of his own testimony and that of four character witnesses, who testified to his reputation in the community for truthfulness. Dade stated that he had resigned from the EPA "out of protest,"

and that he had returned to Washington in the hope of resolving the problems he perceived at the EPA. He said that the gun was not loaded, that the bullets were in his pocket the entire time,[5] that he never intended to use the gun, and that his sole intention was to get himself arrested for taking the gun into the EPA building.

Dade denied forcing Sheffield to make any telephone calls. Although he admitted brandishing the gun, he claimed that Sheffield made the calls willingly, and that in fact it was Sheffield's idea that they go to Lewis' office because Lewis had a better phone system. Dade also denied grabbing Ms. Gardner's arm and stated that he had simply called her over to ask her to notify security. He asserted that his conduct was intended to draw attention to himself and "to do something political."

## II

■ To convict Dade of kidnapping, the government had to prove that he confined Frank Sheffield with the intent to hold or detain him "for ransom or reward or otherwise." D.C.Code § 22–2101 (1989). We have held that the phrase "or otherwise" is to be construed broadly: detention "may be for any purpose that the defendant believes might benefit him." *Davis v. United States,* 613 A.2d 906, 912 (D.C.1992); *accord, Walker v. United States,* 617 A.2d 525, 527 (D.C. 1992); *United States v. Wolford,* 144 U.S.App.D.C. 1, 5, 444 F.2d 876, 880 (1971) (use of the phrase "or otherwise" indicates "a congressional intent that the statute be given a broad application"). Dade argues that the government did not meet its burden because it failed to prove that he had the requisite specific intent or that he benefited from holding Sheffield. We disagree. Viewing the evidence in the light most favorable to the government, keeping in mind the jury's right to assess the credibility of the witnesses and draw all reasonable inferences, *see, e.g., Nelson v. United States,* 601 A.2d 582, 593 (D.C.

---

4. The Administrator is the head of the agency, the highest-ranking person in the EPA.

5. Sheffield had testified that after Dade had talked with Mr. Fox, he pointed the gun up into the air, and "the bullets then fell directly into his

hand." Dade testified that he had kept the gun tilted upwards so that Sheffield would not be able to see from the empty chamber that the gun was not loaded.

1991), we hold that the evidence was sufficient to establish that Dade sought and received the "benefit" to which the statute refers.

The evidence plainly established that Dade held Sheffield against his will. This is "the very essence of the crime of kidnapping." *Chatwin v. United States,* 326 U.S. 455, 464, 66 S.Ct. 233, 237, 90 L.Ed. 198 (1946). Sheffield testified that Dade entered his office, slammed the door, pointed a gun at him, and said, "Frank, sit down, shut up, put your hands on your desk, or I'll blow your fucking head off." He then forced Sheffield to make several telephone calls to various EPA employees and forced him to go to Mr. Lewis' office, all the while holding him at gunpoint. Once they were in Lewis' office, Dade continued to hold Sheffield at gunpoint and demanded that he make more calls until he finally managed to reach an EPA official who was not a member of the "old regime."

■ This evidence was also sufficient to establish that Dade sought and, in fact, received a "benefit" from his conduct. Whether for the good of the public or for himself, Dade sought access to specific EPA officials. He accomplished his purpose by detaining Sheffield against his will until he gained the attention of the EPA employee of his choice, who turned out to be Mr. Fox. Contrary to Dade's argument, the government did not have to establish that he sought revenge. Revenge is only one of the possible motives for kidnapping, and certainly not the only one. All that had to be proved was that Dade expected to gain some kind of "benefit" by his actions. *Walker v. United States, supra,* 617 A.2d at 527. The "benefit" he sought and received was to voice his grievances to someone in EPA's new management.

We therefore reject Dade's argument that the evidence was insufficient to sustain his kidnapping conviction.

**III**

Dade also contends that the prosecutor, in his closing argument, made several prejudicial remarks that require a new trial. He refers in particular to three occasions on which the prosecutor referred to Mr. Sheffield as a "hostage." He also complains about suggestions by the prosecutor that Dade might have been motivated by revenge against Mr. Lewis and that, at one point, Dade might have contemplated shooting Ms. Gardner.

■ In evaluating claims of improper prosecutorial comments, we must first determine whether the challenged comments were improper. If we conclude that they were, we must then view them in context and determine "whether we can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (citation omitted); *accord, McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991); *Irick v. United States,* 565 A.2d 26, 32 (D.C.1989). Applying this standard, we find no impropriety in the prosecutor's remarks.

■ We see no reason to conclude that the prosecutor's use of the term "hostage" was improper. Any attorney is permitted to make reasonable comments on the evidence and to argue all reasonable inferences from the evidence. *Jones v. United States,* 512 A.2d 253, 257 (D.C.1986) (citing cases). The evidence in this case was sufficient to support a reasonable inference that Dade was holding Sheffield captive. There is no merit whatever in Dade's claim that the prosecutor's use of the term "hostage" was a mischaracterization of what happened. A standard reference work defines "hostage" as "an innocent person held captive by one who threatens to kill or harm him if his demands are not met." BLACK'S LAW DICTIONARY 738 (6th ed. 1990). The facts of this case clearly fit that definition.[6] Moreover, even assuming that the use

---

**6.** This court has affirmed convictions in cases in which prosecutors have used substantially more graphic and emotional language. *See, e.g., Mills v. United States,* 599 A.2d 775, 787 (D.C.1991)

(prosecutor referred to victim's pain and suffering as "night of hell"); *Thacker v. United States,* 599 A.2d 52, 61–62 (D.C.1991) (prosecutor described murder victim as "carved up" and

of the word in context was ambiguous, a reviewing court "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974). Dade's challenge to the prosecutor's calling Mr. Sheffield a "hostage" is without substance.

■ We also find no impropriety in the prosecutor's discussion of Dade's possible motive. Defense counsel, in his closing argument, advanced the theory that Dade's conduct was motivated by a desire to stage a civil protest and that he left home carrying a gun because he intended to commit suicide.[7] To rebut this theory, the prosecutor argued that the reason Dade left his house with a gun was to seek revenge against Mr. Lewis. This argument was amply supported by the evidence. It was Lewis who had removed Dade from his position with the EPA, and it was Lewis who had the power to give him his job back. When Dade was holding Sheffield at gunpoint, he said, "Don't worry, Frank, you'll live to see another day.... Nate [Lewis] is the person I want. He's the one that's going to get it." Given this evidence, it was not unreasonable for the prosecutor to suggest to the jury that Dade sought revenge against Lewis.

■ Likewise, the prosecutor's assertion that Dade might have considered shooting Ms. Gardner was not improper. Defense counsel had argued that when Dade called Gardner over to the doorway of Lewis' office, he had no intention of kidnapping her but merely wanted to ask her to alert EPA security personnel. In rebuttal, the prosecutor suggested the implausibility of that argument:

> Ms. Gardner only gets away when Mr. Dade has to make a decision. "She's going to resist me. I've got one hostage here, Mr. Sheffield. Do I shoot this other person that I am trying to take as a second hostage, or do I let her go?"

> And we suggest to you that he made the decision, well, I've got one hostage, I'm not going to shoot her, I'll let her go. That's what happened.

We conclude that it was reasonable for the prosecutor to infer from the evidence, and to argue to the jury, that Dade had no choice but to let Ms. Gardner go unless he was willing to shoot her.

Accordingly, we find no substantial prejudice, and hence no basis for reversal, in the prosecutor's comments. *See McGrier v. United States, supra,* 597 A.2d at 41.

## IV

■ At trial, defense counsel sought to introduce evidence that Dade had contacted a congressional subcommittee to discuss his concerns about the EPA. The court ruled that this evidence was irrelevant to the issue of whether Dade had committed the crime of kidnapping. On appeal Dade argues that the evidence "went to the heart" of his theory of intent, since it tended to prove that he acted not for his own benefit, but for the benefit of the taxpayers.

■ The decision to admit or exclude evidence is committed to the sound discretion of the trial court, and we will not disturb its ruling either way without a showing of abuse. *Perritt v. United States,* 640 A.2d 702, 705 (D.C.1994); *Roundtree v. United States,* 581 A.2d 315, 328 (D.C.1990); *Johnson v. United States,* 452 A.2d 959, 960 (D.C.1982). We agree with the trial judge that the evidence defense counsel sought to admit was not relevant to the issue of whether or not he kidnapped Mr. Sheffield. To be relevant, the evidence must "tend[ ] to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977) (citation omitted), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978). In addition, "the fact

---

"butcher[ed]"). As we said in *Thacker,* "[t]he emotional impact of the case derived mainly from the facts. The prosecutor was under no duty to sugar-coat those facts...." *Id.* at 62.

7. Dade testified on cross-examination that he had originally intended to commit suicide, but that he had changed his mind just before entering the EPA building.

sought to be established by the evidence must be material...." *Reavis v. United States,* 395 A.2d 75, 78 (D.C.1978). The evidence of Dade's contact with the subcommittee may have been probative of his motive, but it was not material to any issue before the jury; that is, it had no bearing on whether he intentionally held Sheffield against his will or whether he received a benefit from what he did. As we have explained, the motivation for a kidnapping is irrelevant; the government need only show that the kidnapper gained a benefit from his actions. We find no error in the exclusion of this evidence.

### V

 Finally, Dade argues that the trial court, in instructing the jury on the "while armed" component of armed kidnapping, erroneously failed to include the definition of a dangerous or deadly weapon as "any object likely to produce death or great bodily injury...." *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.03 (4th ed. 1993). Dade contends that since there was evidence that the pistol was not loaded, and was therefore inoperable, there was a material issue as to whether he was "armed" within the meaning of the statute, and hence this definition should have been included.

The definition of a dangerous or deadly weapon must be included in the instruction only when the object or instrument alleged to be a weapon is not one of the weapons specifically listed in the "while armed" statute. D.C.Code § 22–3202(a) prescribes an enhanced penalty for anyone who commits a crime of violence [8] "when armed with or having readily available any pistol or other firearm (or imitation thereof) *or* other dangerous or deadly weapon" (emphasis added), and then goes on to list twelve such "other" weapons. The only grammatical way to construe this statute is to read it, first, as including all pistols and other firearms (or imitations thereof) within the category of dangerous or deadly weapons, and second, as identifying a dozen other objects as danger-

ous or deadly weapons, in addition to pistols and other firearms. Thus any pistol or other firearm is, by statutory definition, a dangerous or deadly weapon, and the jury need not find specifically that a particular pistol is a dangerous or deadly weapon in order to find the defendant guilty of an armed offense.

The trial judge in this case instructed the jury that it must find that Dade "possessed a pistol or other firearm, or imitation pistol or firearm." This instruction was sufficient. *See Meredith v. United States,* 343 A.2d 317, 319–320 (D.C.1975).

### VI

For the foregoing reasons, the judgment of conviction is

*Affirmed.*

---

8. "Crime of violence" is defined in D.C.Code § 22–3201(f) to include kidnapping.