UNITED STATES of America,
Plaintiff–Appellee,

v.

Jesse J. EVANS, Defendant–Appellant.

No. 97–1120.

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1997.

Decided May 6, 1997.*

Rehearing and Suggestion for Rehearing
En Banc Denied May 23, 1997.

---

* This opinion was initially released in typescript.

David S. Rosenbloom (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee.

Chester Slaughter (argued), Lyle, Slaughter & Brewer, Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, DIANE P. WOOD, and EVANS, Circuit Judges.

CUMMINGS, Circuit Judge.

The trial of Jesse Evans, a Chicago alderman indicted on charges of racketeering (including acts of extortion, accepting bribes, and official misconduct), filing false tax returns, and obstruction of justice, is presently pending in the district court. This interlocutory appeal requires us to review an order of that court granting the government's pretrial motion *in limine* to admit certain testimony by attorney James Koch, which Evans asserts is protected by the attorney-client privilege. While evidentiary rulings are generally not immediately appealable, this Circuit has interpreted the rule announced in *Perlman v. United States*, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (order rejecting a claim of privilege is final and thus appealable), as entitling clients to take an immediate appeal when their attorneys are required to testify or produce documents in the face of an assertion of attorney-client privilege and no substantial breach of the privilege has yet occurred. See *United States v. Davis*, 1 F.3d 606, 607 (7th Cir.1993), certiorari denied, 510 U.S. 1176, 114 S.Ct. 1216, 127 L.Ed.2d 563. Thus our jurisdiction is proper under 28 U.S.C. § 1291. *In re Grand Jury Proceeding*, 68 F.3d 193, 195 (7th Cir.1995). Because Evans' trial is set for May 19, 1997, this Court granted the government's request for an expedited appeal. We now affirm the district court's order.

## I. BACKGROUND

In early January 1996, news reports revealed that Alderman Evans had been targeted in a federal corruption investigation of City officials ("Operation Silver Shovel"). After learning that his long-time friend and occasional client had been implicated in the investigation, attorney John Holden, who is also a Chicago police officer, contacted Evans and spoke with him about Evans' interviews with FBI agents. In the aftermath of this meeting, Holden arranged for and scheduled Evans to meet with three criminal defense attorneys so that Evans could explain his situation, seek legal advice, and decide which of the three attorneys, if any, to retain. On January 8, 1996, after scheduling an appointment on Evans' behalf with attorney James Koch, Holden took Evans to Koch's office where the three conferred. The operative facts governing the resolution of the attorney-client privilege issue presented in this appeal turn entirely on which account of this meeting—Koch's or Holden's—is credited.

Koch testified that Holden phoned him early in the morning on Monday, January 8, 1996, informed him that Evans was going to be indicted and needed legal representation, and asked if Evans and he could come and meet with Koch regarding Koch's possible representation of Evans. Koch also stated that Holden informed him that he was a long-time friend of Evans; there was no mention, however, of any business or legal relationship between Evans and Holden. The three men met later that morning. Koch testified that prior to any sort of substantive discussions regarding the nature of the charges against Evans, he expressed concerns about Holden's presence in the room and its consequences as to the confidentiality of the conversation:

> I told Mr. Evans that, based on what had been represented to me by Mr. Holden, that is that he was there as a personal

friend, that this conversation might not be privileged, and for me to ask intimate facts and details and gather information with the idea of either, well, with the idea of preparing a defense, that I had some concerns about its confidentiality, and that was the initial conversation. And I was told that in fact Mr. Holden was a police officer and a friend, that he was there in that capacity, that he was there as a potential character witness should that ever come to light. That was the initial conversation I had with Mr. Evans, and he said he understood the nature of what I was telling him and that he wanted John Holden to be present for the conversation.

Transcript of Proceedings (12/20/96) at 28–29. When asked by the government if he explained to Evans why the conversation that was about to occur might not be privileged, Koch stated:

I told Mr. Evans that in light of the fact that Mr. Holden is here as a friend and someone to provide perhaps emotional support, that this conversation might not be privileged, and I explained it as it is privileged to an attorney and a client, and there is not a third party present. Mr. Evans said he understood that but wanted Mr. Holden present.

Id. at 31. Further, during cross-examination, Koch added that he had requested that Holden leave the conference room, but that Evans requested that he stay. Id. at 40. When pressed on cross-examination as to whether he expressly informed Evans that the attorney-client privilege was being waived as a result of Holden's presence, Koch testified:

[W]hat I recall is telling him that this might not be privileged because your friend John is here, he says he wants to be a character witness, and this conversation might not be privileged. And I recall Mr. Evans saying that in fact he understood

that but that he wanted Mr. Holden to remain in the meeting.

Id. at 41.

Koch also testified that Holden never indicated that he was there as an attorney for Evans, rather, "he indicated he was there as a friend and, as I said, a potential character witness." Id. at 29. Conversely, when asked on cross-examination, "Did Mr. Holden tell you that he was not acting as an attorney for Mr. Evans," Koch answered, "Yes." Id. at 36. Koch further testified on cross-examination that Holden never said anything about working on the case as one of Evans' attorneys. Id. at 38–39. To the contrary, Koch testified that Holden stated that he could not represent Evans in the pending matter:

Q. [By Evans' attorney]. Did Mr. Holden ever tell you that he could not represent Mr. Evans in any capacity in terms of the case that was pending because he was a Chicago police officer?

A. [By Koch]. I believe that he did.

Id. at 39.

Holden recounted a very different story. He explained that Evans contacted him [1] and described the situation he was in—namely, that he had been interviewed by the FBI and did not know whether there were any charges, or what was going on. Holden decided that they needed to find competent counsel "to find out whether or not I could represent" Evans. Transcript of Proceedings (12/23/96) at 5. Accordingly, he called Koch, told him that he "represented a prominent client," and scheduled the meeting at Koch's office. When he and Evans met with Koch, Holden introduced Evans by saying, "This is my client, Jesse Evans." Id. at 67. When asked if he explained the purpose of the meeting to Koch, Holden testified:

I said to him that we—I did not know what was going on and that we needed somebody who was an expert to advise me and Mr. Evans whether or not I could represent him at that juncture or whether he needed more competent counsel.

---

1. In response to a subsequent question by the court inquiring as to how he was contacted by Evans, Holden replied, "Well, I called him. When I saw his picture on the TV, I . . . called up his wife and I said, 'What's happening? What's going on? Do you need me? Let me know, I'll be there right away.'" Transcript of Proceedings (122.396.) at 64.

*Id.* at 8. Holden explained that he was basically Evans' "family lawyer" and had represented Evans in "several" previous matters including representing Evans' daughter in divorce proceedings, representing Evans' wife in a civil matter, representing Evans' son in connection with a custody or visitation dispute, drawing up miscellaneous contracts for Evans that never went further than the drafting stage, and talking with Evans about setting up a charitable organization to help children in his ward. *Id.* at 11, 60–61, 63.

Holden testified that he never told Koch that he was not Evans' lawyer and never stated that he was there as Evans' friend, not his attorney. *Id.* at 7, 11. Holden also denied saying at the meeting that he was there "not as a police officer, not as a lawyer, but as a friend." *Id.* at 11. Furthermore, Holden testified that he never heard Koch say anything to Evans about the attorney-client privilege or that Holden's presence would destroy the attorney-client privilege. *Id.* When asked, "Did Mr. Koch in any way say to Mr. Evans in your hearing that the conversation he was having with Mr. Evans was not protected," Holden answered, "No." *Id.* at 8.

On cross-examination, the government brought out that Holden has known Evans for close to twenty years, that Holden is a close friend of Evans' family (and at one point dated Evans' niece), that Holden has assisted in Evans' campaigns, that Holden respects Evans tremendously and looks up to him as a father figure, and that Holden told an Assistant United States Attorney working on this case words to the effect that he loved Evans. *Id.* at 12. Holden also testified on cross-examination that he understood that if the meeting with Koch were held to be unprivileged, he might have to testify against Evans at trial. *Id.* at 14.

Holden also testified on cross-examination that he did indicate at the meeting with Koch and Evans that there might be a conflict of interest with respect to his representation of Evans because he was a Chicago police officer but that he was not sure about this because the Evans matter was a federal matter. *Id.* at 42. Moreover, Holden testified that at the time he and Evans met with

Koch, he had not yet determined that it was a criminal matter involved. *Id.* at 48–49. Yet he agreed to the government's characterization of Koch as a "criminal defense attorney" and acknowledged that one of the other attorneys with whom he and Evans met, Michael Monico, was "a prominent criminal defense attorney." *Id.* at 49–50. When asked whether the third attorney, George Leighton, was "a prominent criminal defense attorney," Holden answered, "His name speaks for itself." *Id.* at 50.

On January 8, 1997, the district judge ruled from the bench that Koch's testimony concerning the conversation he had with Holden and Evans on January 8, 1996, is not privileged. In the course of her oral ruling, Judge Bucklo stated:

> [T]o me, it is a question of credibility, and Mr. Koch is a lot more credible than Holden. The basic question is whether Mr. Holden said, as Mr. Koch testified: I am just here as a friend and maybe a character witness. If so, then it is clear that Mr. Evans could not have thought Mr. Holden was there representing him as an attorney. There is just no reason for Mr. Koch to lie.... [H]e told Mr. Evans and Mr. Holden that in that case the conversation might not be privileged, and Mr. Evans, according to the testimony, said that he wanted Mr. Holden to stay anyway.

Transcript of Proceedings (1/8/97) at 2–3. In closing, Judge Bucklo noted, "I have to say, there are a lot of other things about Mr. Holden's testimony that are not believable," *id.* at 3, and "[i]t was clear to me from ... when Mr. Holden took the stand that he was not testifying truthfully." *Id.* at 4.

The next day, Judge Bucklo issued a thorough written opinion in which she set out more fully the legal framework and grounds for her decision. She determined that the central legal issue was "whether an attorney-client relationship existed between Mr. Holden and Mr. Evans in Mr. Koch's office," Memorandum Opinion and Order (hereinafter "Order") 954 F.Supp. 165, at 168, and that the proper resolution of this issue turned on "the relative credibilities of Messrs. Holden and Koch, because the two offer directly opposing accounts of the con-

trolling facts." *Id.* at 168. Consistent with the views expressed in her oral ruling, Judge Bucklo found that "Mr. Holden's testimony was not plausible in numerous respects," *id.* at 168, and "Mr. Holden was simply not believable." *Id.* at 169. In addition to commenting on several pieces of Holden's testimony that she regarded as implausible and the fact that "Holden is a close friend of Mr. Evans, whom he reveres as a father figure," *id.,* Judge Bucklo also noted that her credibility determination was influenced by the witnesses' testimonial demeanor. *Id.* In sum, Judge Bucklo concluded that:

> Mr. Koch testified truthfully that Mr. Holden stated he was at the meeting with Mr. Koch and Mr. Evans as a friend and potential character witness, and not as Mr. Evans' attorney, and when warned that this fact might render the conversation unprivileged, Mr. Evans nevertheless stated he wanted Mr. Holden to remain. Thus, Mr. Holden was not acting as Mr. Evans' attorney at the meeting with Mr. Koch.

*Id.* at 169.

## II. ANALYSIS

■■■ This Circuit has long embraced the articulation of the attorney-client privilege first set forth by Dean Wigmore in his 1904 treatise Evidence in Trials at Common Law. See, *e.g., United States v. White,* 950 F.2d 426, 430 (7th Cir.1991); *United States v. Keplinger,* 776 F.2d 678, 700 (7th Cir.1985), certiorari denied, 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548; *Radiant Burners, Inc. v. American Gas Ass'n,* 320 F.2d 314, 318–319 (7th Cir.1963) (en banc), *certiorari denied,* 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262. Wigmore summarized the essential general principles governing the privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2292 (John T. McNaugh-

ton rev.1961) (hereinafter "Wigmore, Evidence § ___"). The party seeking to invoke the privilege bears the burden of proving all of its essential elements. *White,* 950 F.2d at 430. Further, because the privilege is in derogation of the search for the truth, it is construed narrowly. *United States v. White,* 970 F.2d 328, 334 (7th Cir.1992); *In re Walsh,* 623 F.2d 489, 492 (7th Cir.1980), certiorari denied, 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291. The district court's findings of fact relevant to the essential elements of a claim of privilege will not be overturned unless clearly erroneous. *White,* 950 F.2d at 430; see also *Keplinger,* 776 F.2d at 699. " 'A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746). Moreover, as the Supreme Court further explained in *Anderson:*

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. [citations omitted]
>
> . . .
>
> . . . [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Anderson,* 470 U.S. at 573–575, 105 S.Ct. at 1511–1512. In this regard, this Court has repeatedly expressed its unwillingness to reject a district court's credibility determination based on oral testimony unless the credited testimony is "seriously inconsistent internally, or contrary to established laws of

nature or otherwise fantastic, or irreconcilably in conflict with indubitable documentary or physical evidence, stipulations of fact, admissions, or evidence of equivalent certainty." *Bullard v. Sercon Corp.,* 846 F.2d 463, 466 (7th Cir.1988); see also *Citizens Ins. Co. v. Barton,* 39 F.3d 826, 828 (7th Cir.1994) (quoting Bullard); *Winchester Packaging, Inc. v. Mobil Chemical Co.,* 14 F.3d 316, 319 (7th Cir.1994) (same); *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 674 (7th Cir.1993) (same); *Taylor v. Western & S. Life Ins. Co.,* 966 F.2d 1188, 1197–1198 (7th Cir.1992) (same).

The foregoing standards take us a long way toward affirming the district court's order, for, as Judge Bucklo correctly perceived, resolution of the attorney-client privilege issue in this case boils down predominately to "a question of credibility"; and, to the extent that Judge Bucklo based her decision on her determination that Koch was more credible than Holden, Evans bears an unusually onerous burden in challenging that decision. The key issue, of course, is whether Evans' remarks during the meeting with Koch and Holden were "made in confidence" or whether Holden's presence at that meeting destroyed any reasonable expectation of confidentiality. That issue, in turn, hinges on whether Holden was present in his capacity as Evans' attorney or as Evans' friend, supporter, and potential character witness.

■ The attorney-client privilege shields only those communications by a client to an attorney that were intended to be confidential. Thus as a general matter, the attorney-client privilege will not shield from disclosure statements made by a client to his or her attorney in the presence of a third party who is not an agent of either the client or attorney. See 8 Wigmore, Evidence § 2311 ("One of the circumstances by which it is commonly apparent that the communication is not confidential is the *presence of a third person* who is not the agent of either client or attorney."); *In re Walsh,* 623 F.2d 489, 495 (7th Cir.1980) (attorney required to testify about meetings with client at which third parties were present), certiorari denied, 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291. As Wigmore explains, the presence of such a third party defeats the privilege even though the client may harbor a desire for confidentiality because the privilege "goes no further than is necessary to secure the client's subjective freedom of consultation.... The *presence of a third person* (other than the agent of either) is obviously unnecessary for communications to the attorney as such." 8 Wigmore, Evidence § 2311.

■ Evans attempts to avoid this general rule by arguing that Holden was present at the meeting with Evans and Koch in his capacity as Evans' attorney. As noted above, however, the district judge recognized that resolution of this capacity issue turned on a credibility determination, see Order at 5 ("Central to the resolution of whether Mr. Holden was acting as Mr. Evans' attorney is the determination of the relative credibilities of Messrs. Holden and Koch, because the two offer directly opposing accounts of the controlling facts"), and she resolved the issue by crediting Koch's testimony. Koch expressly testified that Holden stated that he was present at the meeting *not* as an attorney, but as a personal friend of Evans and as a potential character witness. Koch also testified that it was his belief that Holden stated that he could not represent Evans because he was a Chicago police officer. Holden denied having said that he was present as Evans' friend and not as his attorney. Koch also testified that he explained that the conversation might not be privileged as a result of Holden's presence, and that Evans acknowledged this fact but stated that he wanted Holden present anyway. Holden testified that no such conversation occurred. We have thoroughly reviewed the hearing transcripts and find no basis whatsoever for upsetting Judge Bucklo's determination as to the witnesses' relative credibilities or her finding (based as it is on that credibility determination) that Holden was not present at the meeting as Evans' attorney. Koch's testimony was entirely coherent and plausible. Indeed, it is hardly a fantastic proposition that an experienced criminal defense attorney would discuss confidentiality and the attorney-client privilege during the course of an initial consultation with a client accused of criminal conduct, particularly

when the client arrives at the office accompanied by a friend. Nor is it implausible that Holden would have recognized that he was precluded from representing Evans in a criminal matter given his position as a Chicago police officer and that he would have conveyed this information to Evans and Koch. And ill-advised as it might be, it is not implausible that Evans would choose to have his long-time friend and occasional lawyer remain in the room despite its ramifications as to the attorney-client privilege. In short, there were neither "serious internal inconsistencies" in the testimony nor any conflicts with "indubitable documentary or physical evidence, stipulations of fact, admissions, or evidence of equivalent certainty." There was simply Koch's testimony and Holden's testimony, the two of which stood in irreconcilable conflict. In resolving this conflict, we must defer to Judge Bucklo who had "the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subjects' reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record." *United States v. Gerstein,* 104 F.3d 973, 979 (7th Cir.1997).[2]

In his arguments to this Court, Evans places great emphasis on the fact that Holden was Evans' "family lawyer." In Evans' view, this fact weighs heavily in favor of finding that Holden was present at the meeting with Koch as Evans' personal attorney, compels the conclusion that Holden's presence at the meeting did not vitiate the privilege, and—at the very least—establishes that an implied attorney-client relationship existed between himself and Holden during the Koch meeting. Evans' arguments and the

authorities on which he relies in this regard are misplaced for a variety of reasons.

■ Most fundamentally, Evans fails to appreciate the fact that the critical inquiry is whether Holden was acting in his capacity as a professional legal advisor—as opposed to his capacity as a long-time friend who happens to be a lawyer—during his interactions with Evans. The privilege extends only to communications between a client and a professional legal advisor "*in his capacity as such.*" 8 Wigmore, Evidence § 2311. As the Eighth Circuit put it in *Diversified Indus., Inc. v. Meredith,* 572 F.2d 596, 602 (8th Cir.1977), "the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice services or advice that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity. A communication is not privileged simply because it is made by or to a person who happens to be a lawyer." See also RICHARD O. LEMPERT & STEPHEN A. SALTZBURG, A MODERN APPROACH TO EVIDENCE (2d ed.1982) at 659–660 ("When lawyers are consulted as family friends, business advisors, or political consultants, the privilege is inapplicable."). Regardless of Holden's prior attorney-client relationship with Evans (or various members of Evans' family as the case may be), Evans simply failed to meet his burden of establishing that his present involvement with Holden was with Holden in his capacity as a legal advisor. Holden's testimony on this score was simply not credited. Nor does Evans get much mileage by casting Holden's role as that of advising him as to which criminal defense attorney to hire and whether the fees quoted by the various attorneys were reasonable. We can assume that if indeed Evans had sought Holden's services for this purpose Holden's presence at the meeting with Koch would not have destroyed the privilege. The problem

---

2. We note in passing that Holden's lack of credibility is apparent even from our review of the cold record. Most glaringly, Holden's professed lack of knowledge as to whether Evans was implicated in a criminal or civil matter strains credulity (particularly in view of the fact that he contacted three prominent criminal defense attorneys to meet with Evans) and his evasive refusal to acknowledge that bribery constitutes a crime further diminished his credibility. Koch's

testimony that Holden informed him that Evans was going to be indicted further discredits Holden's incredible contention that he did not know whether the Evans matter was civil or criminal in nature. Other examples of Holden's implausible testimony are cited in the district court's Memorandum Opinion at 168–169, and we fully share Judge Bucklo's skepticism with respect to the truthfulness of Holden's testimony.

remains, however, that the district judge simply found Holden's testimony unbelievable: "I conclude that Mr. Koch testified truthfully that Mr. Holden stated he was at the meeting with Mr. Koch and Mr. Evans as a friend and potential character witness, and not as Mr. Evans' attorney, and that when warned that this fact might render the conversation unprivileged, Mr. Evans nevertheless stated he wanted Mr. Holden to remain." Memorandum Opinion at 169. This finding forecloses Evans' argument that Holden was actually present as his attorney rendering advice as to which trial attorney to hire and how much to pay. It is difficult to imagine that Holden would have stated that he was not present as an attorney if, in fact, he was present at the meeting precisely to render legal advice. There is no reason to believe that Judge Bucklo's understanding of the services that might be rendered by an attorney is so narrow as to exclude advising a client as to the abilities of other attorneys. Indeed, the record reflects that Evans alerted Judge Bucklo to his position that this was the nature of Holden's representation of him. See Defendant's Response to Government's Motion to Admit [Docket # 36] at 4.

The various citations offered by Evans as authority for the proposition that Holden's presence at the meeting with Koch did not destroy the attorney-client privilege really stand for little more than that a third party's presence will not defeat the privilege where the third party is an attorney representing the client. Thus in *Dickerson v. Dickerson,* 322 Ill. 492, 153 N.E. 740 (Ill.1926), described by Evans as "directly on point," the Illinois Supreme Court found that the presence of an Oklahoma-licensed attorney at a consultation between his client and an Illinois attorney concerning the transfer of real property did not destroy the privilege, stating:

> The general rule is that, where a communication between attorney and client takes place in the presence of a third party, such communication is not privileged; but that rule does not apply to the present case, *for the reason that the third person who was present was an attorney from Oklahoma, who was acting ... for [the client], and who, together with [the client], applied to [Illinois counsel] for advice as to the Illinois law applicable to the making and delivery of voluntary conveyances, with which the Oklahoma attorney was not familiar.*

*Id.,* 153 N.E. at 742 (emphasis added).[3] We shall not consider separately each of the cases cited by Evans. It is sufficient to note that each is premised on the assumption that the "third party" was actually an attorney working for the client. See, *e.g., New York Underwriters Ins. Co. v. Union Constr. Co.,* 285 F.Supp. 868, 869 (D.Kan.1968) ("Communications and consultations between attorneys representing the same party are privileged."); *Burlington Indus. v. Exxon Corp.,* 65 F.R.D. 26, 36 (D.Md.1974) (communications between in-house counsel and outside counsel are privileged, "[t]o hold otherwise merely penalizes those attorneys who write or consult with additional counsel representing the same client for the same purpose"). Evans' difficulty lies not in the controlling legal principles but in applying those principles to the facts of this case. There was no error in Judge Bucklo's factual determination that Holden was not present at the Koch meeting in his capacity as an attorney. The cases relied on by Evans therefore have no applicability.

Similarly, Evans is not aided by cases holding that the presence of a third party at an attorney-client consultation does not defeat the privilege where the third party's presence was needed to make the conference possible or to assist the attorney in rendering legal services. See, *e.g., Miller v. Haulmark Transport Sys.,* 104 F.R.D. 442, 445 (E.D.Pa.1984). Beyond stating the general rule, Evans has failed to carry his burden of proving that Holden's presence was necessary to accomplish the objective of his consultation. Evans' only showing on this score lies in Holden's discredited testimony that he was present at the meeting in order to advise

---

**3.** Similarly, in *NLRB v. Harvey,* 264 F.Supp. 770 (W.D.Va.1966), the "third party" was the attorney's partner and the client had been represented for eight years by "the firm." The court's opinion in *Harvey* provides no basis for concluding that the attorney's partner was not equally involved in the client's representation.

Evans as to the relative abilities of the several defense attorneys who were to be consulted. Giving effect to the district court's factual findings, we must conclude that Holden was present merely as a friend and potential character witness. This is plainly insufficient to establish the necessity of Holden's presence.

Perhaps recognizing the futility of arguing that Holden was actually acting in the capacity of his attorney (or was otherwise necessary to the consultation), Evans attempts to invoke the notion of an "implied attorney-client relationship." In *Westinghouse Elec. Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311 (7th Cir.1978), certiorari denied, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346, this Court embraced the notion of an implied attorney-client relationship, stating: "The professional relationship for purposes of the privilege for attorney-client communications 'hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.'" *Id.* at 1319 (quoting McCormick on Evidence (2d ed.1972) § 88). However, subsequent to the Westinghouse decision, this Court rejected the contention that "an individual's mere subjective belief that he is represented ... will always be sufficient to demonstrate that such a relationship existed for the purpose of the attorney client privilege," *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985), certiorari denied, 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548, and explained that:

> at least in the absence of any relatively clear indication by the potential client to the attorney that he believed he was being ... represented, we think no ... attorney-client relationship can be inferred without some finding that the potential client's subjective belief is minimally reasonable.

*Id.*

Evans maintains that "a[n] implied attorney-client relationship originated on January 6 or 7, when Holden went to Defendant's home and spoke with Defendant about his interviews with the FBI agents and about the allegations. (12/23/96 Tr. at 65). Holden gave Defendant legal advice by explaining that Defendant was probably not arrested during the earlier FBI interviews because he was neither printed nor photographed." Def.'s Br. at 31–32. In the first place, it is worth noting that the passage from the district court proceedings cited by Evans does not clearly support his assertion that he discussed the allegations against him with Holden. Because it is somewhat illuminating with respect to the present issue, we quote the testimony at some length:

Q. [By the Court]. Without telling me the substance of any request for advice, how did you, how were you contacted by Mr. Evans with respect to whatever conversation led to you calling Mr. Koch?

A. [By Holden]. Well, I called him. When I saw his picture on the TV, ... I called him up ... and I said, "What's happening? What's going on? Do you need me? Let me know, I'll be there right away." ....

Q. How did it happen then that you contacted Mr. Koch and these other attorneys?

A. I told Jesse, we have to find out what's going on here, and we have to find somebody who knows what they are doing.

A. So this was actually the result of you calling him and-

Q. Yes, trying to figure out what's going on. I wanted to help him.

A. Do I understand that you offered to set up some interviews with some attorneys?

A. Oh, definitely. I said we needed to do that.

Q. And he accepted your offer?

A. Yes.

Q. Do I understand then that this is not as a result of his seeking advice from you?

A. I'm sorry. He did seek advice from me as to trying to figure out what was going on, what was happening to him. I said that I didn't understand what was going on with him, but that I'll find out for him, that I'll make sure that he's taken care of.

Q. I think I'm a little confused about this. You said you called up and talked to his wife?

A. Yes.

Q. And then what happened?

A. Well, she said she didn't understand what was going on, and she didn't think there was anything needing my involvement at the time ... And she said she'd talk to Jesse to find out what was going on and get back to me, and I went over to their house I think that weekend. And it was my belief that he felt he had been arrested, and I asked him, you know, if he had been fingerprinted and photographed, and he said, "No." I said, "Well I don't think you've been arrested," so we went from there. I didn't think there was any problem.

Transcript of Proceedings (12/23/96) at 64–65. Contrary to Evans' contentions on appeal, this passage hardly reveals any "manifest[ ] intention to seek professional legal advice" from Holden on the part of Evans. To the contrary, as Judge Bucklo discerned, Evans' conversation with Holden was actually initiated—unsolicited from the outset—by Holden.[4] Nor is it evident from the record that Evans disclosed any confidences to Holden under any expectation of confidentiality other than that which might be expected as between friends discussing troubling circumstances. Evans' attempt to create the air of the meeting as being one involving the rendition of professional legal advice by stating that "Holden gave Defendant legal advice by explaining that Defendant was probably not arrested during the earlier FBI interviews because he was neither fingerprinted nor photographed" borders on the ridiculous and warrants little comment other than that this showing falls far short of meeting his burden.

Evans' strongest evidence on this score is to be found in Holden's testimony—elicited by Evans' attorney, essentially as rehabilitation after the court's examination of Holden—that Evans asked Holden to represent him:

Q. [By Evans' counsel]. Did Mr. Evans ask you to represent him when you talked to he and his wife that weekend?

A. [By Holden]. Yes.

Q. And do you recall what he said to you and what you said to him?

A. He said, "Can you help me," and I said, "Yes."

Q. And did you understand that to mean legal help as opposed to just helping him mow the lawn or something?

A. That's what I understood. He wanted me to help him find out what was going on in a legal capacity because he was confused.

Transcript of Proceedings (12/23/96) at 66–67. However, even if we credit this testimony and assume that at some point during the meeting at Evans' home Evans sought Holden's representation and Holden indicated his ability to help (thus supporting the notion that Evans subjectively believed Holden to be acting as his attorney), it is plain that the circumstances had changed by the time of the meeting with Koch. Accepting Mr. Koch's testimony as true, as did the district court, we find that Holden explained at the meeting that he could not represent Evans in the "Operation Silver Shovel" matter in any capacity because of his position as a Chicago police officer. See Transcript of Proceedings (12/20/96) at 39. Furthermore, Koch testified that he advised Evans "that in light of Mr. Holden's being present in a nonlegal capacity," *id.* (that is, "because your friend John [Holden] is here, [and] he says he wants to be a character witness," *id.* at 41; see also *id.* at 28–29 ("he was there as a personal friend," "I was told he was there as a police officer and a friend")), the conversation might not be privileged, and he asked Holden to leave the room. *Id.* at 40. Finally, Koch testified that Evans stated that he understood the nature of what he was being told, yet wanted Holden to remain in the room. *Id.* at 28–29, 31, 40, 41. Thus whatever claim Evans had to a subjective belief that Holden was representing him prior to the meeting with Koch, he no longer could have

4. This is not to say, of course, that an attorney-client relationship can never be found where the attorney initiated the contact with the client. Our point is simply that, in the context of searching for a client's manifest intention to seek professional advice as evidence of an implied attor-

ney-client relationship, evidence that the client's friend, who happens to be a lawyer, came to the client's home, made a few observations about what appears to have transpired, and assured the putative client that he would make sure he is taken care of, is not weighty evidence.

reasonably believed that to be the case after these initial disclosures were made at the meeting with Koch. Accordingly Evans' appeal to the notion of an implied attorney-client relationship is unavailing.

■■ Evans' most remarkable contention is that Holden's presence at the meeting with Koch did not destroy the attorney-client privilege because Holden and Evans shared a "common interest." The "common interest" or "joint defense" doctrine "generally allows a defendant to assert the attorney-client privilege to protect his statements made in confidence not to his own lawyer, but to an attorney for a co-defendant for a common purpose related to the defense of both." *Keplinger,* 776 F.2d at 701. The same general rule (sometimes going by the name "common defense rule") protects "communications by a client to his own lawyer ... when the lawyer subsequently shares them with co-defendants for purposes of a common defense." *United States v. McPartlin,* 595 F.2d 1321, 1336–1337 (7th Cir.1979), certiorari denied, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43. In *United States v. Schwimmer,* 892 F.2d 237 (2d Cir.1989), the Second Circuit explained the doctrine as follows:

> The joint defense privilege, more properly identified as the "common interest rule," has been described as "an extension of the attorney client privilege," *Waller v. Financial Corp. of Am.,* 828 F.2d 579, 583 n. 7 (9th Cir.1987). It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. *See United States v. Bay State Ambulance and Hosp. Rental Serv.,* 874 F.2d 20, 28 (1st Cir.1989). Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected.

*Id.* at 243–244.

■■ Evans' argument runs as follows: (i) Holden is a Chicago police officer. (ii) Under Chicago Police Department Rule 21, Holden is required to report promptly to the Department any information concerning any crime or other unlawful action. (iii) Evans confided information relating to his alleged involvement in a crime and Holden did not report it to the Department. (iv) Holden is therefore subject to departmental disciplinary action. Therefore, Holden and Evans share a common interest in establishing Evans' innocence. We cannot accept Evans' contention that the common interest rule has any application to the present case.

In the first place, Evans' and Holden's purported common interest cannot be said to have arisen until after the meeting with Koch at which time Evans allegedly disclosed information about his involvement in unlawful activity. Thus the disclosures in Koch's office were not made "in the course of an ongoing common enterprise" with the intention of furthering that enterprise. Much more importantly, we do not believe that the "common interest" relied upon by Evans is of the sort encompassed by the common interest rule, which is generally invoked in cases involving criminal or civil co-defendants,[5] *see Keplinger, supra; McPartlin, supra,* joint licensors, see, *e.g., Burlington Indus. v. Exxon Corp.,* 65 F.R.D. 26 (D.Md.1974); *Stanley Works v. Haeger Potteries, Inc.,* 35 F.R.D. 551 (N.D.Ill.1964), and related corporate entities pursuing a joint claim, see, *e.g., In re Grand Jury Subpoenas, 89–3 and 89–4, John Doe 89–129,* 902 F.2d 244 (4th Cir.1990). Here Holden's purported "interest" in Evans' legal proceedings has no meaningful connection with the events and occurrences giving rise to the prosecution, Evans' defense strategies, or the legal principles involved. Indeed, it is difficult to imagine what necessity there could possibly be for the pooling or exchange of any information between Evans' defense attorneys and Holden *vis-a-vis* Holden's potential defense to a Departmental

---

5. As Evans correctly notes, the rule has even been found to apply to prospective defendants in separate civil actions. See *Transmirra Prods. Corp. v. Monsanto Chem. Co.,* 26 F.R.D. 572 (S.D.N.Y.1960). However, those defendants were all alleged to have conspired to infringe the plaintiff's patent. In view of the nature of the allegations, the court determined that the defendants had a common interest in actual or prospective litigation sufficient to protect communications between counsel for the defendants.

disciplinary proceeding.[6] In short, Holden's interest in the Evans' proceedings is far too attenuated to support application of the common interest rule. As noted above, the attorney-client privilege is in derogation of the search for truth and its scope must therefore not be expansively construed. Evans' novel application of the "common interest rule" offers no sound occasion for broadening the cloak of the privilege's protection.

 Finally, having determined that the district court did not err in finding that Evans' disclosures to Koch were not made "in confidence" as a result of Evans' request that Holden remain in the room notwithstanding the fact that he (Holden) was not present in his capacity as an attorney, we find no merit in Evans' contentions that Koch is somehow violating canons of professional responsibility or the Illinois Rules of Professional Conduct by testifying in this matter. While Koch may not have taken the most prudent course by discussing Evans' case with federal prosecutors before obtaining an administrative opinion or judicial determination that the subject disclosures were not privileged, no basis is apparent for concluding that state ethics rules preclude Koch's testimony. As the government correctly notes, the Illinois Rules of Professional Conduct (RPC) authorize the disclosure of a client's confidences or secrets when required by court order. RPC 1.6(c)(1).

For the foregoing reasons, the district court's order granting the government's motion to admit Mr. Koch's testimony is affirmed.

---

**6.** It is not at all clear that an acquittal for Evans would result in exoneration for Holden; after all, Chicago Police Department Rule 21 requires an officer to report "any information concerning any crime or other unlawful action." On its face, the Rule does not require certainty that the accused has indeed committed a crime. It simply requires the officer to report any known *evidence* of a crime.

